UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
In re Chapter 11

29 Brooklyn Avenue, LLC, Case No. 12-40279-CEC

Debtor.
---------------------------------------------------------------X

DECISION AFTER TRIAL

Appearances:

Michael Cohen, Esq.
Tenenbaum Berger & Shivers, LLC
26 Court Street, Penthouse
Brooklyn, NY 11242
*Attorneys for Stephen R. Chesley, Receiver*

David Carlebach, Esq.
Shella Sadovnik, Esq.
The Carlebach Law Group
55 Broadway, Suite 1902
New York, NY 10006
*Attorneys for 29 Brooklyn Avenue, LLC*

CARLA E. CRAIG
Chief United States Bankruptcy Judge

This decision resolves a dispute between 29 Brooklyn Avenue, LLC (the "Debtor"), a single asset real estate debtor which confirmed its 100% plan in February 2013, and Stephen Chesley ("Mr. Chesley" or the "Receiver"), a receiver appointed during foreclosure proceedings prior to the bankruptcy and superseded by the Debtor's bankruptcy filing, over approximately $80,000 in unpaid pre-petition expenses and commissions incurred by the Receiver and approximately $150,000 in pre-petition disbursements made by the Receiver. Prior to filing for bankruptcy, the Debtor tried and failed to remove the Receiver by petitioning the state court. By filing for bankruptcy the Debtor was able to take advantage of § 543(b),[1] which requires a custodian of property of the estate to deliver such property to the debtor-in-possession upon commencement of the bankruptcy case, and to remove the Receiver by operation of bankruptcy law. The Receiver filed a proof of claim in the bankruptcy case for unpaid expenses that he incurred prior to the bankruptcy and for his commissions, and the Debtor objected to this proof of claim. After the Receiver objected to confirmation of the Debtor's plan, the Debtor agreed to hold $77,664.72, the amount of the Receiver's proof of claim at the time, in escrow pending resolution of the Debtor's claim objection so that the plan, which otherwise paid all unsecured creditors in full and reinstated the Debtor's obligations to the secured creditor, could be confirmed. Thereafter, in addition to objecting to the Receiver's proof of claim, the Debtor moved to surcharge the Receiver for improper or excessive disbursements made during the receivership. After hearing the evidence adduced over eight trial days, the Court issues these findings of fact and conclusions of law.

---

[1] Unless otherwise indicated, "Section" or "§" refers to a section under title 11 of the United States Code (the"Bankruptcy Code"), and "Rule" refers to the Federal Rules of Bankruptcy Procedure.

## JURISDICTION

This Court has jurisdiction of this core proceeding pursuant to 28 U.S.C. § 1334(b), and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012. This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

In September 2009, New York Community Bank initiated foreclosure proceedings with respect to the property located at 29 Brooklyn Avenue, in Brooklyn, New York (the "Property" or "29 Brooklyn Avenue"). (Debtor's Pre-Trial Br. 2, ECF No. 147, Case No. 12-40279.)[2] At that time, the Property was owned by Brooklyn Avenue Square, Inc., a different entity from the Debtor. In March 2010, the state court first appointed a receiver for the Property, and in July 2010, Mr. Chesley was appointed as a subsequent receiver. (Debtor's Pre-Trial Br. 2-3, ECF No. 147.) Mr. Chesley came into possession of the Property, pursuant to a notice to attorn, in October 2010. (Chesley Decl. 1, ECF No. 197.)

Over a year after the state court first appointed a receiver for the Property, in May 2011, the Debtor borrowed money from Northfield Bank to purchase the Property and pay off New York Community Bank. (Northfield Bank Proof of Claim, Claim No. 2-1, Case No. 12-40279.)[3] Yisroel Barron, who had managed the Property prior to the first receiver's appointment, is the principal of the Debtor. (Debtor's Pre-Trial Br. 4, ECF No. 147.) In November 2011, the Debtor sought to remove the Receiver in state court (Debtor's Pre-Trial Br. 3, ECF No. 147), and in December 2011, the state court denied the Debtor's motion to remove the Receiver (Reply to

---

[2] Citations to "ECF No." are to papers filed on the docket of Case Number 12-40279.

[3] Citations to "Claim No." are to claims filed on the claims register of Case Number 12-40279.

Claim Obj. 2-3, ECF No. 62). On January 18, 2012, the Debtor filed for bankruptcy, and the Receiver subsequently turned over possession of the Property to the Debtor. (Chesley Aff. 1, ECF No. 197.)

On April 24, 2012, the Receiver filed a proof of claim, which he amended on October 5, 2012, and again June 25, 2014 (the "Proof of Claim"). (Proof of Claim, Claim No. 3-3.) On June 1, 2012, the Debtor objected to the Proof of Claim (the "Objection"). (Objection, ECF No. 37.) On December 19, 2012, the Debtor filed a chapter 11 plan (Plan, ECF No. 73), and on January 30, 2013, the Receiver objected to confirmation (Obj. to Confirmation, ECF No. 83). On February 6, 2013, the Receiver withdrew his objection to confirmation, and in exchange the Debtor agreed to hold $77,664.72, the full amount of the Proof of Claim at the time, in escrow pending resolution of the Objection. (Stipulation of Settlement, ECF No. 89.)

On February 13, 2013, the Court confirmed the Debtor's plan, which provided for reinstatement of the secured creditor's mortgage and payment of all other creditors in full. Plan confirmation was based, in part, on the Debtor's representation that the Debtor was holding enough funds in escrow to cover the full amount of all claims, including the disputed Proof of Claim. (Decl. in Supp. of Conf., ECF No. 92; Order Conf. Plan, ECF No. 93.) At a hearing on March 13, 2013, the Court ordered the Receiver to file an accounting pursuant to Rule 6002(a) and § 543(b)(2). (Mar. 13, 2013 Tr. 19:6-14, ECF No. 98; Order Directing Receiver to File Accounting, ECF No. 97.) On March 15, 2013, the Receiver filed a final accounting (the "Accounting"). (Accounting, ECF No. 96.) Thereafter, the parties engaged in discovery with respect to the Objection. (Disc. Scheduling Order, ECF No. 108.)

On June 25, 2014, the Debtor filed its pre-trial brief in which, in addition to objecting to the Proof of Claim, the Debtor, for the first time, moved to surcharge the Receiver under

§ 543(c)(3) based on disbursements reported in the Accounting. (Debtor's Pre-Trial Br. 2, ECF No. 147.) On June 26, 2014, the Receiver filed his pre-trial brief. (Receiver's Pre-Trial Br., ECF No. 151.) The parties filed a joint pre-trial statement on June 25, 2014. (Joint Pre-Trial Statement, ECF No. 148.) The Court held evidentiary hearings on July 2, July 30, July 31, August 4, October 27, October 28, October 29, and October 30, 2014. The parties filed their post-trial briefs on February 27, 2015.

## LEGAL STANDARD

A state court receiver is a "custodian" within the meaning of the Bankruptcy Code, as defined in § 101(11). 11 U.S.C. § 101(11)(C); In re Snergy Properties, Inc., 130 B.R. 700, 703 (Bankr. S.D.N.Y. 1991). Section 543(b) requires a custodian to "deliver to the trustee any property of the debtor held by" the custodian "on the date that such custodian acquires knowledge of the commencement of the case . . . ." 11 U.S.C. § 543(b)(1). Pursuant to § 543(c)(2), a superseded custodian may receive payment of "reasonable compensation" for pre-petition services rendered, and costs and expenses incurred, and such compensation and reimbursement of expenses is entitled to first priority administrative expense status pursuant to § 503(b)(3)(E). 11 U.S.C. §§ 543(c)(2), 503(b)(3)(E); In re Forde, 507 B.R. 509, 521 (Bankr. S.D.N.Y. 2014); Snergy, 130 B.R. at 703. What constitutes reasonable compensation "is a determination of federal, not state, law." Forde, 507 B.R. at 521.

Several bankruptcy courts have recognized five factors for determining the reasonableness of a superseded custodian's request for compensation: "the time and labor expended by the custodian; the benefit of the custodian's services to the debtor and the estate; the size and/or complexity of the estate; what the custodian would have received if he or she had been appointed as trustee for the debtor, and the quality of the custodian's services." Forde, 507

B.R. at 521; see also In re Youngquist, 501 B.R. 877, 891 (Bankr. D. Kan. 2013) (listing the same five factors). The most important of these considerations is whether the custodian's actions benefitted the estate. See In re Bodenheimer, Jones, Szwak, & Winchell L.L.P., 592 F.3d 664, 674 (5th Cir. 2009) ("the 'benefit-to-the-estate' doctrine remains a nearly universally-recognized interpretative scheme for § 503(b)(3)(E)"); In re 245 Associates, 188 B.R. 743, 748 (Bankr. S.D.N.Y. 1995) ("the services rendered by a pre-petition custodian [should be accorded priority] to the extent those services actually benefitted the estate"); In re Lake Region Operating Corp., 238 B.R. 99, 102 (Bankr. M.D. Pa. 1999) ("an overarching consideration [in awarding compensation under § 503(b)(3)(E)] is whether the specific services benefitted the estate").

"The burden of proof for 'entitlement to an administrative expense is on the claimant and the measure of proof is a preponderance of the evidence.'" In re S & Y Enterprises, LLC, 480 B.R. 452, 462 (Bankr. E.D.N.Y. 2012) (quoting In re Drexel Burnham Lambert Grp. Inc., 134 B.R. 482, 489 (Bankr.S.D.N.Y.1991)). See also 4 Collier on Bankruptcy ¶ 503.04[1] (16th ed. 2014) ("[R]equests for payment of administrative expenses are not entitled to the presumption of correctness that is accorded claims prepetition creditors assert through proofs of claim. An entity seeking allowance of an administrative expense has the burden of proof.").

Section 543(b) also requires a custodian to "file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody, or control" of the custodian. 11 U.S.C. § 543(b)(2). Pursuant to Rule 6002, the bankruptcy court is obligated to review the custodian's accounting and "determine the propriety of the administration, including the reasonableness of all disbursements." Fed. R. Bankr. P. 6002(b). According to the advisory committee notes to Rule 6002, "The examination under subdivision (b) may be initiated . . . on the motion of, or the filing

of an objection to the custodian's account by, the trustee or any other party in interest . . . ." Fed. R. Bankr. P. 6002 advisory committee notes.

Not only is a superseded custodian's accounting subject to review under Rule 6002, but the bankruptcy court has the authority under § 543(c)(3) to surcharge a custodian "for any improper or excessive disbursement, other than a disbursement that has been made in accordance with applicable law or that has been approved . . . by a court of competent jurisdiction before the commencement of the" bankruptcy case. 11 U.S.C. § 543(c)(3); see In re Sundance Corp., 149 B.R. 641, 650 (Bankr. E.D. Wash. 1993) (noting that "it would be impossible to perform the task[] of determining reasonable compensation if a bankruptcy judge could not review the quality of a receiver's performance").

As several courts have recognized, whether a receiver should be surcharged for pre-petition disbursements is a question of state, not federal law. See In re China Vill., LLC, No. 10-60373, 2012 WL 32684, at *6 (Bankr. N.D. Cal. Jan. 4, 2012) (approving a receiver's final accounting and awarding pre-petition fees and expenses under § 503(b)(3)(E), subject to a surcharge — based on California law that a court-appointed fiduciary may be surcharged for failure to pay taxes due — for penalties and interest associated with the receiver's late payment of taxes); Lake Region, 238 B.R. at 102-03 (awarding compensation to a superseded receiver pursuant to § 503(b)(3)(E) but surcharging him because he failed to secure a bond, as required under Pennsylvania law); Sundance, 149 B.R. at 649-50 (holding that the bankruptcy court had jurisdiction to surcharge a receiver regarding the performance of its state court duties, and looking to Washington law to determine whether the receiver should be surcharged).

This conclusion, that state law controls in deciding whether to surcharge a receiver for pre-petition disbursements, follows from the language in § 543(c)(3) excepting from surcharge

"disbursement[s] . . . made in accordance with applicable law." 11 U.S.C. § 543(c)(3). This deference to state law in evaluating a receiver's pre-petition performance, mandated by § 543(c)(3), is appropriate as a policy matter, because to hold otherwise would subject a receiver to potential surcharge for actions he or she took in accordance with state law during a time prior to bankruptcy when he or she had no reason to think that a different standard would apply. Therefore, the Court will look to New York law to determine whether the Receiver should be surcharged for any of his pre-petition disbursements with respect to the Property.

In New York, "It is well settled that compensation may be denied to a receiver who has grossly mismanaged the property entrusted to him or her . . . ." Fed. Deposit Ins. Corp. v. 65 Lenox Rd. Owners Corp., 704 N.Y.S. 2d 613 (N.Y. App. Div. 2d Dep't 2000). Gross mismanagement, however, does not mean incurring unnecessary or unreasonable expenses, violating minor terms of the order of appointment, or making repairs to the property in good faith. See David Realty & Funding, LLC v. Second Ave. Realty Co., 788 N.Y.S. 2d 371 (N.Y. App. Div. 1st Dep't 2005) (holding that the receiver should not be disqualified from receiving commissions for failure to, among other things, keep the mortgaged premises properly insured, pay taxes as they came due, and pay the common charges in a timely fashion, because such failures were de minimis and caused no harm to the estate); Corcoran v. Joseph M. Corcoran, Inc., 521 N.Y.S. 2d 757, 760 (N.Y. App. Div. 2d Dep't 1987) (holding that the fact that the receiver hired his wife as a secretary did not constitute gross mismanagement, and to the extent that the services of the wife were found to be unnecessary, the appropriate remedy was to disallow compensation for the wife out of the funds on hand); and Utica Partition Corp. v. Jackson Const. Co., 194 N.Y.S. 303 (App. Div. 1st Dep't 1922) (holding that where there was no proof "tending to show that the leases and repairs were not made in good faith," then the receiver

should not be surcharged for improper expenditures with respect to the leases and repairs). In other words, in order to be classified as "gross mismanagement," the receiver's actions must result "in great loss to the estate." Title Guarantee & Trust Co. v. Adlake Corp., 290 N.Y.S. 1007, 1010 (N.Y. Sup. Ct. Queens Cty. 1936).

Here, the Receiver has the burden to show that he is entitled to the fees and expenses in his Proof of Claim and that the services for which he is seeking compensation were reasonable. Pursuant to §§ 503(b)(3)(E) and 543(c), the Court will review the Proof of Claim to determine his entitlement to compensation, under the federal standard. Pursuant to Rule 6002(b), the Court also will review the Receiver's Accounting. The Court will determine if the Debtor has met its burden to show that the Receiver should be surcharged for improper or excessive disbursements, based on the standard prescribed by New York law.[4]

## DISCUSSION

The Receiver asserts in the most recent amended Proof of Claim that he is entitled to $80,757.22. (Proof of Claim 1, Claim No. 3-3.) In addition to the unpaid invoices for goods and services purchased by the Receiver for the Property, this amount includes $9,980.41 in commissions and $450.00 paid as the premium for a renewal bond, which the Receiver will withdraw upon cancellation of the surety on the bond by the Court nunc pro tunc to April 4, 2013. (Proof of Claim 4, Claim No. 3-3; Receiver's Post-Trial Br. 1, ECF No. 201, and 71-72, ECF No. 204.) In total, the Debtor objects to $189,136.10 in fees and expenses incurred by the Receiver. Of this amount, the Debtor objects to $62,799.57 of fees and expenses sought in the

[4] The issue of whether the Receiver is entitled to attorneys' fees incurred in defending his Proof of Claim or in defending the Debtor's motion to surcharge him was not addressed in the trial and is not addressed in this Decision.

Proof of Claim and an additional $126,336.53 of disbursements listed in the Accounting. (Summ. of Objections, ECF No. 166.)

Although the Debtor identifies specific fees and expenses that it contends are improper, it does not distinguish between fees and expenses which are sought in the Proof of Claim and those which are reflected in the Accounting. Instead, the Debtor filed an omnibus objection, without regard for whether the Receiver paid the expense in question out of the rents of the Property prior to the bankruptcy filing or whether the Receiver is seeking reimbursement for an unpaid expense in the Proof of Claim. The Debtor presented evidence in a similar omnibus fashion at trial. Nevertheless, the Court must apply the standards set forth by applicable law, and will distinguish between unpaid fees and expenses sought by the Receiver in the Proof of Claim, which will be allowed to the extent that they are reasonable, and fees and expenses that were paid during the receivership out of the rents of the Property and that are listed in the Accounting, which will be subject to surcharge to the extent that the Receiver grossly mismanaged the Property. The Debtor makes a number of arguments, and each will be addressed in turn.

## I. The Receiver's Accounting is Sufficient

The Debtor argues that the Accounting is insufficient because, although the Receiver included invoices for every expense, he did not include bank statements to show that the funds were actually disbursed. The Debtor argues that, because of this omission, the Proof of Claim should be disallowed. (Debtor's Post-Trial Br. 11-12, ECF No. 196.) The Debtor bases this

argument on In re Ira Haupt & Co., 287 F. Supp. 318 (S.D.N.Y. 1968),[5] which stands for the proposition that an accounting must be

> under oath and include information concerning what assets and property of the bankrupt were initially acquired by the [receiver]; what, if any, additional assets and property were thereafter acquired by the [receiver]; his disposition of all or part of such assets and property; his disbursements for expenses and services; what monies, income or fees he received incidental to acquiring, husbanding and disposing of any assets or property; and a submission by the liquidator of his claim for compensation for services rendered.

Ira Haupt, 287 F. Supp. at 323. However, this case does not hold that a receiver must necessarily file bank statements showing all disbursements which are attested to in an accounting. In fact, language in Ira Haupt suggests the contrary: "I do not mean to suggest that . . . the [receiver] must set forth voluminous schedules revealing every detail of every transaction." Ira Haupt, 287 F. Supp. at 323.

The Accounting here satisfies the requirements set forth in Ira Haupt: it was filed under oath; lists all rent billed and collected by apartment; lists the vendor name, invoice description, invoice date, and amount of each invoice, as well as the date the invoice was paid and check number; includes a copy of every invoice; and includes the Receiver's claim for compensation. (Accounting, ECF No. 96.) It should be noted that the Debtor engaged in extensive discovery of the Receiver for more than a year after the Accounting was filed and could have sought bank statements if the Debtor felt that they were necessary to evaluate the Accounting. In short, the Accounting contains the information that is required under § 543 and Rule 6002, and the Proof of Claim will not be disallowed, nor will the Receiver be surcharged, based on the Receiver's failure to file a sufficient Accounting. To the extent that the Debtor argues that the Receiver

---

[5] The Debtor cited a Second Circuit case with the same title, In re Ira Haupt & Co., 398 F.2d 607 (2d Cir. 1968), in its post-trial brief. (Debtor's Post-Trial Br. 12, ECF No. 196.) The Court assumes that this citation is a mistake, because the Second Circuit case does not stand for the proposition for which it was cited.

should be surcharged for improper disbursements reflected in the Accounting, those arguments will be addressed below.

## II. The Debtor's Objections to Compensation and Reimbursement of Expenses Sought in the Proof of Claim and to Expenses Set Forth in the Accounting

The Debtor has three main objections: that the Receiver paid too much for heating oil, that many of the services invoiced were not actually performed, and that most of the attorney's fees incurred by the Receiver were caused by the Receiver's mismanagement of the Property.

### A. Oil Expenses

The Accounting lists $103,996.98 in invoices paid to Chief Energy Corp. and Boro Fuel Oil during the receivership. (Accounting Ex. C, ECF No. 96-4.) The Proof of Claim lists another $47,547.82 in unpaid invoices due to Chief Energy Corp. (Proof of Claim 5, Claim No. 3-3.) In total, then, the Receiver spent $151,544.80 on heating oil during the receivership. As discussed above, the Receiver has the burden to show that he is entitled to payment for the unpaid invoices for oil in his Proof of Claim, and that the oil purchases for which he is seeking reimbursement were reasonable. Given the undisputed fact that the invoices in the Proof of Claim reflect oil used at the Property, the Receiver has made a prima facie case for entitlement to reimbursement. However, the Debtor argues that during the eighteen months that the Receiver was in possession of the Property, he purchased too much oil at too high a price. (Debtor's Pre-Trial Br. 9-11, ECF No. 147.) The Debtor contends that instead of approximately $150,000, the Receiver should have spent $42,000 on heating oil. (Summ. of Objections, ECF No. 166-1.) Therefore, based on the evidence presented at trial, the court will determine whether the Receiver has met his burden to show, by a preponderance of the evidence, that the $47,547.82 worth of heating oil invoices in the Proof of Claim represent expenses that were reasonably incurred. The Court will also determine if the Debtor has met its burden to show that any part of the

$103,996.98 in heating oil disbursements shown in the Accounting constituted mismanagement of the Property warranting surcharge.

**i. Quantity of Oil Used**

With respect to the quantity of oil, the Debtor notes that the annual amount of oil that the Receiver purchased for the Property was greater than the annual amount purchased for the Property in each of the two years prior to the receivership. The Debtor further challenges the reasonableness of the quantity of oil purchased by the Receiver by comparing it to the quantity of oil purchased by the Receiver for other buildings he managed while he was managing 29 Brooklyn Avenue. The Receiver does not dispute that he purchased more oil than Mr. Barron did in prior years or than was purchased for other properties of which he was custodian; rather, he argues that his oil purchases were reasonable and did not constitute gross mismanagement of the Property.

The Debtor's evidence presented on this issue may be summarized as follows. From May 24, 2009 through May 24, 2010 — a time period before the receivership when Mr. Barron managed the Property — 10,700 gallons of oil in total was purchased for use at the Property. (Debtor's Pre-Trial Br. 9, ECF No. 147; Barron Decl. 4, ECF No. 147-1.) Mr. Barron testified that the building averaged approximately $30,000.00 in expenses for oil per year while he managed the Property. (Barron Decl. 4, ECF No. 147-1.) He also testified that the total cost of oil purchased for the Property in 2009, based on his recollection, was between $25,000.00 and $38,000.00. (Trial Tr. 75:13-76:1, July 30, 2014, ECF No. 177.) Mr. Barron's testimony is corroborated by the testimony of Michael Meadvin, the Senior Vice President and General Counsel of Castle Oil, a retail and wholesale supplier of petroleum products which supplied oil to 29 Brooklyn Avenue during the 2007-08 and 2009-10 heating seasons. Mr. Meadvin testified

that from May 2009 to May 2010, Castle Oil delivered 10,701 gallons of oil to 29 Brooklyn Avenue. (Trial Tr. 12:1-23, Oct. 29, 2014, ECF No. 186.)

The Receiver, on the other hand, purchased 36,339 gallons of oil at a cost of over $150,000 during the receivership. (Debtor's Post-Trial Br. 16, ECF No. 196.)[6] The Debtor argues that the sheer quantity of oil used by the Receiver demonstrates that his oil purchases were unreasonable. (Debtor's Post-Trial Br. 16-18, ECF No. 196.) The Debtor notes that while that the Receiver was in possession of the Property, he only purchased oil in ten and a half months, and that "the quantity of oil ordered by the Receiver, in the 10 ½ months that he actually paid for oil, was **three times** the yearly consumption used by the Property in previous years." (Debtor's Post-Trial Br. 16, ECF No. 196.)

The Debtor's argument, that this evidence shows that the Receiver purchased excessive and unreasonable quantities of oil for the Property, is flawed for several reasons. First, it should be noted that the Receiver was in possession of the Property from October 12, 2010, until January 18, 2012. (Chesley Decl. 1, ECF No. 197.) This time period encompassed two heating seasons, and it would be inappropriate to compare oil usage during the entire receivership with oil usage during a single year, because a single year contains only one heating season. (Trial Tr. 124:17-125:16, Oct. 29, 2014, ECF No. 186.) Nor does the fact that the Receiver only purchased oil during ten and a half months of the receivership make it appropriate to compare his oil purchases in these ten and a half non-consecutive months with a prior period of twelve consecutive months, because during any extended period of time the Property may not require oil deliveries in certain the warm weather months or months when there was oil left in the tank.

[6] The Debtor states that the Receiver purchased 37,506 gallons of oil during the receivership, based on the Receiver's Analysis of Fuel Costs chart, but this number is incorrect, as the chart shows 29 deliveries to the Property for a total of 36,339 gallons. (Analysis of Fuel Costs, ECF No. 149 Ex. E.)

Further, the Debtor's argument that the Receiver used too much oil because he used more than was used by the Property in prior years fails to account for all of the factors which could have affected oil consumption at the Property during the receivership as compared to prior periods, such as differences in outdoor temperature across heating seasons, or whether prior to the receivership the building was kept at an unreasonably low temperature. Mr. Meadvin testified that although "[t]here are a lot of factors that affect [oil] consumption . . . the number of degree days is the principal factor in comparing [oil] consumption within a given building" across years. (Trial Tr. 21:21-22:8, Oct. 29, 2014, ECF No. 186.) According to Mr. Meadvin, a "degree day" is a unit of measurement representing the number of Fahrenheit degrees below 65 that the mean outdoor temperature is on a given day. (Trial Tr. 20:17-24, Oct. 29, 2014, ECF No. 186.) That is to say, the primary factor that drives oil consumption for any building, including 29 Brooklyn Avenue, is the outdoor temperature. Here, the Debtor provided no evidence with respect to the degree days where the Property is located, either before or during the receivership. The bare fact that the Property used more oil during the receivership than in prior years is insufficient to conclude that the Receiver's oil purchases were unreasonable, and the Debtor's argument on this point is rejected.

The Debtor's second argument, that a comparison of oil usage at 29 Brooklyn Avenue to oil usage at other properties under the Receiver's management shows excessive oil usage at the Property during the receivership, is similarly without merit. The Debtor argues that "between December [2010] and February 2011, the Receiver used 13,198 gallons of oil for the . . . Property, while he used only 8,866 gallons of oil for the [30th Street] building during the same time period." (Debtor's Pre-Trial Br. 10, ECF No. 147.) The 30th Street building is 66 units and 29 Brooklyn Avenue is 20 units, and the Debtor argues that the Receiver's fuel use should have

been in proportion to the relative size of the buildings. (Debtor's Pre-Trial Br. 10, ECF No. 147.) To begin with, the Debtor's assertion that the Receiver purchased only 8,866 gallons of oil for the 30th Street building between December 2010 and February 2011 is wrong; the actual amount shown is more than 20,000 gallons (as compared to 13,198 gallons purchased for the Property). (Analysis of Fuel Costs, ECF No. 149 Ex. E.) Furthermore, the Debtor's analysis of fuel usage across buildings is misleading because it compares the fuel consumption during a select three months of a particular heating season, and in doing so does not account for fuel in the tank at the beginning or end of the three month period. The oil usage numbers referenced by the Debtor come from a chart made by the Receiver which shows a comparison of oil costs across buildings. (Analysis of Fuel Costs, ECF No. 149 Ex. E; Sadovnik Decl. 2, ECF No. 149.) An analysis of this same chart using a larger sample size of one year demonstrates the inadequacy of the Debtor's argument: during the 12 month period from November 2010 to October 2011, 27,473 gallons of oil were purchased for 29 Brooklyn Avenue and 42,618 gallons of oil were purchased for the 30th Street building. (Analysis of Fuel Costs, ECF No. 149 Ex. E.) Contrary to the Debtor's argument, the total gallons purchased per year shown by this chart are in fact generally in proportion with the relative size of the buildings. Moreover, the Debtor presented no evidence concerning factors, other than the number of apartment units, that could account for differences in fuel usage between buildings, such as the relative age and condition of the buildings or the boilers, or the overall square footage of the structures. The Receiver will not be surcharged, nor will the Proof of Claim be disallowed, on the basis of this evidence.

The Debtor next argues that the primary cause of the increased oil expenses during the receivership, in comparison to the prior two years, was the Receiver's failure to use CompuSave, a computer system installed at the Property prior to the receivership which was designed to

control heating oil usage, or failure to properly maintain the boiler. Each of these arguments will be addressed in turn.

**ii. The CompuSave System**

The Debtor argues that the Receiver's failure to use CompuSave amounted to gross mismanagement of the Property and caused unreasonable fuel expenses. Mr. Barron testified that he used CompuSave prior to the receivership and that, when CompuSave is operational, the boiler at the Property will not use more oil than is necessary. (Trial Tr. 29:14-30:12, Aug. 4, 2014, ECF No. 179.) He testified that, although not turned on, CompuSave was available to the Receiver. (Trial Tr. 30:13-23, Aug. 4, 2014, ECF No. 179.) Victor Phillip, an employee of CompuSave, the company that installed the boiler computer system at the Property, testified that installation generally involves placing thermostats within apartments so that building owners can remotely monitor indoor building temperature. (Trial Tr. 8:24-10:1, Oct. 27, 2014, ECF No. 184.) He testified that in a building without a CompuSave system, the boiler would be controlled by the outdoor temperature and the building owner would not have the ability to remotely monitor indoor building temperature. (Trial Tr. 10:2-18, Oct. 27, 2014, ECF No. 184.) He testified that, in his opinion, use of the CompuSave system in an apartment building reduces oil consumption. (Trial Tr. 11:22-23, Oct. 27, 2014, ECF No. 184.)

The Debtor contends that the Receiver disabled the CompuSave system at the Property at some point during the receivership. Mr. Phillip testified that in January 2012, after the Receiver returned control of the Property to the Debtor, the Debtor contacted him to repair the CompuSave computer, and that when he inspected the boiler at the Property, the heat timer was not working properly and the CompuSave computer was disconnected at its power source. (Trial Tr. 17:11-18:7, Oct. 27, 2014, ECF No. 184.) According to Mr. Phillip, if a heat timer were

broken on a boiler, a properly installed CompuSave computer would still control the boiler. (Trial Tr. 14:16-15:2, Oct. 27, 2014, ECF No. 184.) In addition, Mr. Phillip testified that he observed that the backup heat timer was not connected to a sensor, causing too much oil to be used. (Trial Tr. 19:3-20:1, Oct. 27, 2014, ECF No. 184.)

The evidence presented by the Receiver paints a different picture. The Receiver testified that he was not involved in the day to day management of the Property, or the purchase of oil, because these responsibilities were handled by his managing agent, BPC Management. (Trial Tr. 101:20-102:5, Aug. 4, 2014, ECF No. 179.) Douglas Rosenberg, the principal of BPC Management, which managed the Property from October 2010 until it was turned over to the Debtor, testified that he did not direct anyone to disconnect the CompuSave system. (Trial Tr. 109:5-15, Oct. 29, 2014, ECF No. 186.) He testified that, in his experience as a building manager, systems such as CompuSave do not adequately heat a building. As Mr. Rosenberg explained:

> The only way these systems work [is if] the boiler is in good operating order and [if] the sensors are put in the coldest part of the building, and then you need to calibrate the sensor to the boiler system, which involves an extensive period of time, a) to identify the cold part of the building, and b) [to] calibrate the length of the burn. . . . However, anybody that puts sensors in the hottest part of the building, i.e., the top floor, all that does is shut the boiler off prematurely and does not provide heat to the coldest units in the buildings . . . . So when I get involved with these systems, and I've seen a couple of them on receiverships [for] broken down buildings, my instructions . . . would be to discontinue this system because it really doesn't perform the savings or services as promised . . . .

(Trial Tr. 110:9-111:5, Oct. 29, 2014, ECF No. 186.)

The testimony offered on behalf of the Debtor about the benefits of the CompuSave system is not persuasive for several reasons. First, neither Mr. Barron nor Mr. Phillips is an unbiased witness. Mr. Barron is not an expert in CompuSave systems, and he is the principal of the Debtor, with an economic interest in the outcome of this contested matter. Mr. Phillips is not

an expert either; and he is an employee of the company which installs the system whose benefits he testified about. The opinions of these two non-experts about the benefits of the CompuSave system are entitled to little weight.

Further, even if oil usage at the Property would have been reduced had CompuSave been in use during the receivership, there is no evidence on this record on which it would be possible to determine how much oil would have been saved. Mr. Barron testified that he used CompuSave prior to the receivership and that he used less oil prior to the receivership, but this testimony fails to establish a causal link between using CompuSave and reduced oil usage.[7] Mr. Phillips's testimony that CompuSave guarantees that its customers "should save at least 15 percent within the first 18 months" that CompuSave is installed provides no information about the actual performance of the system. (Trial Tr. 13:22-14:3, Oct. 27, 2014, ECF No. 184.)

Nor does the record establish the status of the CompuSave system at the Property during the receivership and the extent to which it was in use. It is unclear how Mr. Barron knew that the CompuSave system was available to the Receiver, and Mr. Phillips's testimony about repairing CompuSave after the receivership does not provide any information about the status of CompuSave during the receivership. Nor does Mr. Phillips's testimony that, after the Receiver returned the Property to the Debtor, he found the backup heat timer disconnected from a heat sensor, provide any information about the status of these devices or the operation of the boiler during the receivership. Certainly the testimony provides no basis to conclude that any of the Receiver's oil purchases was unreasonable or constituted gross mismanagement of the Property.

[7] As noted above, Mr. Meadvin testified that the principal factor affecting oil use is the outdoor temperature. No testimony was presented concerning this factor, or how it impacted oil use at the Property during the years in question.

The Debtor also argues that the testimony of Anteneh Nigussu, a former resident of the Property and the Property's "impromptu porter" prior to the receivership (Debtor's Post-Trial Br. 22, ECF No. 196), regarding a discussion that Mr. Nigussu had with Royce Douglas, a property manager for BPC Management, shows that BPC Management knew that CompuSave was not operational, knew that this was causing the boiler to run at an unreasonably high temperature causing, among other problems, leaks in the apartments at the Property, and did nothing to remedy the situation. (Debtor's Post-Trial Br. 22-23, ECF No. 196.) Mr. Nigussu testified that he told Mr. Douglas that leaving the boiler running at too high a temperature would cause water to leak throughout the Property, and that in response Mr. Douglas "said the F word" and "left the boiler full blast . . . ." (Trial Tr. 50:21-51:3, Oct. 28, 2014, ECF No. 185.) However, Mr. Nigussu's testimony fails to support the Debtor's allegations of mismanagement for several reasons. To the extent that Mr. Nigussu's testimony is offered to show that the boiler was running at an excessive temperature causing water leaks, it is entitled to little weight. First of all, Mr. Nigussu describes a single instance of water leakage at an unspecified time during the receivership. Second, the record does not show that Mr. Nigussu had knowledge or expertise about this boiler's performance or boiler maintenance generally that would qualify him to testify about whether the boiler was running at an appropriate temperature or whether there was connection between the boiler's operation and water leaks.[8,9]

---

[8] Mr. Nigussu testified that he observed technicians called by Mr. Barron working on the boiler; that Mr. Barron showed him "like last year" (after the receivership ended) how to operate the boiler; and that he knows "basic stuff just to run the boiler." (Trial Tr. 53:4-9, Oct. 28, 2014, ECF No. 185.)

[9] Mr. Rosenberg testified that the Property was "leaking like a sieve when the receiver took over possession," and that although the building generated insufficient funds to "go in and reconstruct" the leaky galvanized pipes which were the underlying cause of the problems, "damaged pipes were addressed as best we could." (Trial Tr. 64:6-65:12, July 31, 2014, ECF No. 178.)

To the extent that Mr. Nigussu's testimony is offered to show that BPC Management was informed of problems with the boiler and improperly failed to rectify the situation, it is unpersuasive as well. As noted above, Mr. Nigussu's testimony fails to establish that the boiler was not operating properly during the receivership. Moreover, there is no reason to think that Mr. Douglas, a property manager, was acting unreasonably in not heeding the advice of Mr. Nigussu, a former porter of the building and an employee of Mr. Barron, regarding the appropriate management of the boiler system.

On this record, it does not appear that the Receiver's decision not to use CompuSave was unreasonable, or that it amounted to gross mismanagement warranting surcharge. Mr. Rosenberg's testimony that in his experience heat monitoring systems such as CompuSave do not work to adequately heat a building supports the conclusion that deciding whether to install or use a CompuSave system is a management decision that falls within the business judgment of the building manager. Therefore, if CompuSave was not operational during the receivership, that fact does not support the conclusion that the Receiver's oil purchases were unreasonable, or amounted to gross mismanagement.

**iii. Failure to Monitor the Boiler**

The Debtor further argues that the Receiver failed to monitor the boiler during the receivership, which resulted in excessive oil use and amounted to gross mismanagement of the Property. Mr. Barron testified that in May 2011, after he purchased the Property, he observed that the boiler had black marks on it, meaning, in his opinion, that it was not properly maintained. (Trial Tr. 30:24-31:12, Aug. 4, 2014, ECF No. 179.) He testified that, in his opinion, if a boiler is not properly maintained it can use too much oil. (Trial Tr. 31:13-32:15, Aug. 4, 2014, ECF No. 179.) Jeffrey Cohen is the President of Boro Fuel, a heating oil and

boiler compliance management company that, among other services, conducts yearly boiler inspections and performs boiler maintenance. (Trial Tr. 186:10-187:4, July 30, 2014, ECF No. 177.) Mr. Cohen testified that Boro Fuel serviced the Property in the mid-2000s. (Trial Tr. 187:15-25, July 30, 2014, ECF No. 177.) He testified that Boro Fuel performed annual boiler inspections on the Property in 2010, 2011, and 2012. (Trial Tr. 188:1-189:2, July 30, 2014, ECF No. 177.) However, he testified that Boro Fuel did not perform maintenance for the boiler at the Property from October 2010 to January 2012, when the Receiver was in possession of the Property. (Trial Tr. 190:23-25, July 30, 2014, ECF No. 177.)

The Debtor's argument that the Receiver should be surcharged because he failed to monitor the boiler properly during the receivership and therefore incurred excessive expenses for heating oil is unpersuasive. To the extent that the Debtor argues that it was the Receiver's negligence or gross mismanagement which caused improper heating oil consumption, the Debtor fails to provide a causal connection between Mr. Barron's and Mr. Phillips's observations of what they considered to be indications of poor maintenance of the boiler and the increased oil consumption during the receivership. That is to say, there are a number of factors that could have caused an increase of oil consumption — for example, if the Receiver kept the building at a higher temperature than the prior year or if the outdoor temperature was lower during the receivership — and the Debtor provided no factual support for the conclusion that poor maintenance caused the increase.

The fact that the Receiver did not hire Boro Fuel for maintenance is a business decision that the Receiver was entitled to make, and not the type of gross mismanagement that would subject the Receiver to surcharge. Maintenance is different than the annual inspection, and involves cleaning the burner, vacuuming the boiler, tuning up the unit, and doing an efficiency

test. (Test. of Mr. Cohen, Trial Tr. 192:11-16, July 30, 2014, ECF No. 177.) Mr. Cohen testified that his company performed an annual inspection of the boiler at the Property in November 2010, during the receivership. (Trial Tr. 188:8-189:24, July 30, 2014, ECF No. 177.) The Receiver could have decided not to hire a company to perform boiler maintenance, in addition to the annual inspection, for a number of reasons, including that the Property was not generating sufficient income to cover the regular boiler maintenance expenses. In any event, Mr. Cohen testified that it is typical for his company to do annual boiler inspections at a building but not perform regular maintenance. (Trial Tr. 192:24-193:14, July 30, 2014, ECF No. 177.)

For the foregoing reasons, the record does not establish that the amount of oil purchased for the Property during the receivership was excessive or improper. Here, the Debtor's argument, in substance, is that if Mr. Barron had been managing the Property during the receivership, he would have made different decisions. However, there is no showing on this record that the Receiver engaged in any improper conduct with respect to purchasing oil for the Property, or that his practices in this regard were unreasonable.

**iv. Cost of Oil**

The Debtor also argues that the Receiver paid too much per gallon of heating oil. In support of this contention, the Debtor again points to the Receiver's Analysis of Fuel Costs, and notes that the price per gallon was at times 50 cents to a dollar more for 29 Brooklyn Avenue than for the other buildings under the Receiver's management, even though the gallons purchased per invoice were at times roughly equivalent. Mr. Barron testified that in June 2011, during the receivership, he contacted Chief Energy Corp., the oil supplier that the Receiver used, and received a quote for 1,100 gallons of oil for $3,735.88. (Trial Tr. 76:12-84:15, July 30, 2014, ECF No. 177.) The Debtor argues that this per-gallon quote is 20% less, on average, than

what the Receiver was paying for oil. (Debtor's Post-Trial Br. 19, ECF No. 196.) The Receiver argues that the Debtor's price analysis is overly simplistic, and fails to account for the fact that oil companies charge customers different per-gallon prices based on the payment history of the customer, and that receiverships represent an especially high credit risk. (Receiver's Post-Trial Br. 56-57, ECF No. 203.)

The Debtor's argument that the Receiver should be surcharged because he paid too much per gallon of oil must be rejected because it fails to account for all of the factors that affect heating oil price, such as the wholesale price on the particular day of purchase or the payment history of the purchaser. For example, Mr. Cohen, the President of Boro Fuel, testified that he charges more per gallon of oil if a purchaser has high arrears or is a payment risk. When asked how his company sets fuel prices, Mr. Cohen testified as follows:

> It depends. I mean if the customer let's say, for example, is behind on the bills or owes a lot of money, there's a pretty good chance that they're [not paying] 30 cents over the [wholesale price]; they'll probably pay a lot more, 80, 90 cents. It really depends on what the arrears are like. That's the reality. It's the time value of money. . . . Some buildings that are in receivership, I'll get paid better than when the customer had the building. Some buildings don't, you know, so it's the conversation that I have with the receiver. If Harry tells me I got tons of money and I'll pay that bill within 30 days, then I'm good with that. If he says this building is going to be a struggle, then I have to charge them a higher rate.

(Trial Tr. 199:7-200:21, July 30, 2014, ECF No. 177.)

The testimony from Mr. Barron about a quote that he received in June 2011 for a lower per-gallon price than the Receiver paid provides no support for a conclusion that the Receiver's decision to purchase heating oil at a particular price was unreasonable or improper, because the quote that Mr. Barron received did not take into account the payment history of the Property while in the Receiver's possession. Likewise, the comparison of fuel purchases across buildings does not take into account the payment history at the particular buildings. The fact that the Receiver paid more per gallon of oil delivered to 29 Brooklyn Avenue than to the other buildings

under his management may be because 29 Brooklyn Avenue represented a greater payment risk than the other buildings or that 29 Brooklyn Avenue had more extended payment terms than the other buildings. (Analysis of Fuel Costs, ECF No. 149 Ex. E.) In this regard, Mr. Rosenberg testified that two months into the receivership, the Receiver's payment terms were 90 days after delivery, that the Receiver was unable to bring its balance of unpaid oil invoices down to zero before the beginning of the 2011-12 heating season, and that as a result the Receiver's payment terms eventually changed to 120 days after delivery. (Trial Tr. 20:8-17, July 31, 2014, ECF No. 178.) Mr. Rosenberg further testified, in his direct written testimony, that the oil prices for the Property increased as the receivership progressed as "a direct result of the Receiver's lack of funds to pay Chief [Energy Corp.]" (Rosenberg Aff. 9, ECF No. 198.) Nothing in the purchasing history of oil suggests that the Receiver's decision to purchase heating oil at a particular price was unreasonable or improper.

**v. Six Month Gap in Oil Deliveries**

The Debtor also argues that because the Receiver failed to purchase oil from June through December 2011, the Property must not have had hot water, and as a result, the Property received a violation for inadequate heat supply in November 2011, during the receivership. (Debtor's Post-Trial Br. 20-21, ECF No. 196.) To the extent that this is an objection to the Proof of Claim, it is overruled because the Debtor has not identified any unreasonable expenses incurred by the Receiver resulting from this. In any event, the Debtor has not provided sufficient factual basis from which to determine that this gap in oil purchasing during the receivership resulted in a lack of heat or hot water, much less that it constituted gross mismanagement of the Property. The Debtor points to evidence that the New York City Department of Housing Preservation and Development ("HPD") assessed a violation on the Property for insufficient heat

in apartment 5S in November 2011. (Debtor's Post-Trial Br. 21, ECF No. 196.) This single violation for lack of heat in a single apartment is not sufficient to surcharge the receiver for gross mismanagement.

For these reasons, the Receiver will not be surcharged for improper or excessive disbursements relating to the heating oil purchases, and his Proof of Claim will be allowed to the extent that it includes unpaid invoices for heating oil.

**B. Exterminating Services**

The Debtor objects to $1,567.79 in exterminating services performed by Universal Exterminating Inc., encompassing eight visits between April 2011 and December 2011 at between $163.31 and $370.18 per visit. (Debtor's Post-Trial Br. 24-26, ECF No. 196.) This includes three unpaid invoices totaling $696.80 in the Proof of Claim and five paid invoices totaling $870.99 in the Accounting. (Proof of Claim 7, Claim No. 3-3; Accounting Ex. C, ECF No. 96-4.) The Debtor argues that because the Receiver did not produce tenant signatures proving that the extermination work was actually done, he should not be entitled to reimbursement for these expenses. (Debtor's Post-Trial Br. 24-26, ECF No. 196.)

Mr. Rosenberg, the principal of BPC Management, testified that in his experience, an exterminator generally requests the signature of the tenant in the apartment which he serviced, but that some tenants refuse to sign. (Trial Tr. 54:2-17, July 31, 2014, ECF No. 178.) With respect to 29 Brooklyn Avenue's exterminating services, he testified that the building did not have a live-in super, and so there was no documentation of whether exterminating services were performed at a particular apartment. (Trial Tr. 55:18-56:3, July 31, 2014, ECF No. 178.) He testified that his company has no tenant signatures from 29 Brooklyn Avenue which would

verify that the exterminating work was performed. (Trial Tr. 56:15-22, July 31, 2014, ECF No. 178.)

The Debtor's argument, that the Receiver should be surcharged and the Proof of Claim should be disallowed because the Receiver has provided insufficient proof that exterminating work was performed, must be rejected. Here, the record supports the conclusion that this exterminating work was actually performed: the Receiver produced invoices for exterminating work in the Accounting and the Proof of Claim, which was corroborated by Mr. Rosenberg's testimony, and the Debtor has provided no evidence to support the conclusion that Universal Exterminating Inc. did not perform exterminating services at the Property. For these reasons, the Receiver will not be surcharged for the exterminating charges listed in the Accounting, and his Proof of Claim will be allowed to the extent that there are the unpaid invoices to Universal Exterminating Inc.

**C. Con Edison**

The Debtor also argues that one paid invoice, for $48.07, was for an incorrect Con Edison account and should not have been the responsibility of the Debtor's estate. (Debtor's Pre-Trial Br. 14, ECF No. 147; Sadovnik Decl. 2, ECF No. 149; Sadovnik Decl. Ex. I, ECF No. 149-10.)[10] This Con Edison invoice indeed appears to be a mistake, and the Receiver withdrew it in his post-trial brief. (Receiver's Post-Trial Br. 21 and 39, ECF No. 202.) Accordingly, the Receiver will be surcharged $48.07 for this disbursement. The Debtor next objects to four unpaid invoices

[10] Prior to trial, the Debtor also objected to an invoice for $150.14 from S&H Glazer Bros. to "Barbara Odwak Receiver," a copy of which the Receiver included in the Accounting. (Debtor's Pre-Trial Br. 14, ECF No. 147; Sadovnik Decl. 2, ECF No. 149; Sadovnik Decl. Ex. J, ECF No. 149-11.) Because the Receiver did not list a disbursement associated with this invoice in the list of paid invoices in the Accounting, a copy of this invoice must have been added to the Accounting by mistake. (Accounting Ex. C, ECF No. 96-4.) The Debtor did not address this invoice at trial or in its post-trial brief. Accordingly, the Court will not surcharge the Receiver for this invoice because the Receiver did not make an associated disbursement.

in the Proof of Claim for amounts owed to Con Edison for a total of $1,818.19. (Debtor's Pre-Trial Br. 16, ECF No. 147; Summ. of Objections, ECF No. 166-1.) At trial, the Receiver stipulated to withdraw these four invoices from his Proof of Claim. (Trial Tr. 56:3-16, July 30, 2014, ECF No. 177.) Therefore, the Proof of Claim will be reduced an additional $1,818.19.

### D. Janitorial Services and Repair Work

The Debtor's next argument is that the Receiver's invoices for maintenance and general contracting work done by BMS General Contractor Services ("BMS") were for work that was never actually done. In total, the Debtor objects to $6,891.75 in invoices for work done by BMS that the Receiver includes in the Proof of Claim and in the Accounting. (Summ. of Objections, ECF No. 166-1.) These invoices are between $300.00 and $755.95 each. The Receiver seeks compensation for five unpaid invoices, totaling $3,161.75, in his Proof of Claim. The remaining eight invoices, totaling $3,730.00, were paid by the Receiver and are included in the Accounting. The Debtor spent a substantial portion of an eight day trial eliciting conclusory and unsubstantiated testimony from multiple witnesses to support the argument that this work was not done. The testimony on the subject of janitorial and repair work at the Property during the receivership may be summarized as follows:

Mr. Rosenberg testified that BMS was retained in March 2011 to provide janitorial services to the building, and that BMS was paid $600 per month. (Trial Tr. 85:19-22 and 95:25-96:16, October 29, 2014, ECF No. 186.) He testified that his company, BPC Management, did not receive invoices from BMS, but that instead it set up a recurring monthly payment to BMS for its services, and that BMS was "sloppy with their invoices." (Trial Tr. 59:17-60:8, July 31, 2014, ECF No. 178.) He testified that the building was "leaking like a sieve when the Receiver took over possession of the property" and that, because there were insufficient funds in the

Receiver's account to repair the damages, they could not be fully repaired. (Trial Tr. 64:6-14, July 31, 2014, ECF No. 178.) He further testified that he hired contractors to stop the leaks and to repair plaster, but that he was not able to repair the underlying causes of the damage — probably, in his opinion, due to leaking galvanized pipes and poor maintenance in the past — because he did not have sufficient funds. (Trial Tr. 64:16-18 and 65:1-12, July 31, 2014, ECF No. 178.)

Mr. Barron testified that he visited the Property at various times during the receivership but never saw anybody who looked like they could be from BMS cleaning the Property. (Trial Tr. 72:5-23, July 30, 2014, ECF No. 177.) He testified that after he purchased the Property, on May 26, 2011, he observed that the Property was not maintained because, among other things, he saw evidence of leaks and accumulated garbage. (Trial Tr. 69:11-18, July 30, 2014, ECF No. 177.) Mr. Barron testified that after he purchased the Property, he visited it at a frequency of between three times a week and daily. (Trial Tr. 69:19-22, July 30, 2014, ECF No. 177.) He further testified that during the receivership, he paid to clean the garbage from the building and the hallway, among other things, because he wanted the building to "work." (Trial Tr. 23:2-24:1, Aug. 4, 2014, ECF No. 179.)

Two tenants in the building also testified at trial. Mary Bally, a tenant on the 2nd floor, who runs a child care business out of her apartment, testified that the building was dirty and garbage was piling up on the sidewalk outside in front of the building during the receivership. (Trial Tr. 4:15-5:24, Oct. 28, 2014, ECF No. 185.) Dewayne McLaurin, a tenant on the third floor, testified that from May 2011 until January 2012, he never observed BMS or any other company clean the building, and that during that time garbage piled up in the hallway. (Trial Tr. 26:12-28:7, Oct. 28, 2014, ECF No. 185.)

The Debtor raises a few specific objections to invoices provided by the Receiver. One such unpaid invoice in the Proof of Claim was for $625.81 for repairs to "all step [sic] at back of fire escape." (Sadovnik Decl. Ex. K, ECF No. 149-12.) The Debtor objects to this expense, based on Mr. Barron's written testimony that the "fire escape was never fixed." (Barron Decl. 6, ECF No. 147-1.) Another unpaid invoice in the Proof of Claim was for $755.95 for repair work on the intercom system in the building, on the front door frame, and to various locks throughout the building. (Sadovnik Decl. Ex. L, ECF No. 149-13.) The Debtor objects to this expense, based on Mr. Barron's written testimony that "nothing in the intercom [system] had changed since" 2009. (Barron Decl. 6, ECF No. 147-1.)

In this case, the Receiver provided invoices for six and a half months of janitorial services at $600.00 per month, plus six additional invoices for repair work. The Debtor's argument that the Receiver has not proven that such work was actually performed is not persuasive. The Accounting sets forth a list of all payments to BMS. Mr. Barron's testimony, that he did not witness BMS performing their janitorial duties, and the tenants' testimony to the same effect, is unpersuasive for the simple reason that BMS could have performed their duties while they were not at the Property. Nor does the testimony that garbage piled up at the Property demonstrate that BMS did not perform the services for which it was paid. Given that the services were performed approximately once a month, it is certainly possible that garbage piled up between cleanings. With respect to the repair work on the fire escape and intercom system, the fact that Mr. Barron, when he took over management of the Property, found that "nothing in the intercom had changed," does not show that work was not done by the Receiver on the intercom during the receivership. For these reasons, the Receiver is entitled to compensation for

the services rendered by BMS, and the Debtor has not met its burden to surcharge the Receiver for these services.

The Debtor also argues that paid invoices totaling $970.00 provided by the Receiver in the Accounting for work done by MBC on Call, another contractor used by the Receiver, were insufficient because they do not show the date when and location where the service was performed, "thereby making it impossible to verify whether these services were actually performed." (Debtor's Post-Trial Br. 29-30, ECF No. 196.) This argument must be rejected. The invoices provided by the Receiver for MBC on Call are sufficiently detailed and appear to be for expenses reasonably incurred; based on the descriptions provided in the invoices, such as "install new lock," "emergency service," and "apt. H fix receptacle," the Receiver hired MBC on Call to perform routine and emergency maintenance work at the Property. (Debtor's Post-Trial Br. 29, ECF No. 196.) Further, the MBC on Call invoices are dated, indicating the date on or about which the work was performed. (Accounting Ex. C, ECF No. 96.)

Even if the Accounting failed to include the date and to identify the apartment at which services performed by the Receiver's contractors, the Receiver should not be surcharged for this reason alone. See In re Ira Haupt & Co., 287 F. Supp. 318, 323 (S.D.N.Y. 1968) (listing the requirements for a sufficient accounting, including "disbursements for expenses and services" of a receiver but not the date and location of services performed). Nothing in the record suggests that the Receiver's hiring of MBC on Call was unreasonable, or that the Receiver grossly mismanaged the Property by hiring this contractor to do routine and emergency maintenance work. For this reason, the Debtor's argument that the Receiver should be surcharged for hiring MBC on Call is also rejected.

**E. Landlord-Tenant Counsel Fees**

The Debtor objects to a charge for legal services performed by Tenenbaum Berger & Shivers LLP ("Tenenbaum Berger"), the Receiver's landlord-tenant counsel, for $3,347.50. This charge is listed as unpaid in the Proof of Claim, with an invoice description of "Balance of Legal Fees." (Proof of Claim 7, Claim No. 3-3.) However, although the Receiver included invoices for all of the other services performed by Tenenbaum Berger, he did not submit an invoice for this amount. Nor is any invoice number for this expense listed in the Proof of Claim. Because the Receiver has not submitted an invoice for this charge, nor offered any explanation, he has not met his burden under § 503(b) and the Proof of Claim will be reduced by $3,347.50.

The Debtor objects to $1,232.50 in additional unpaid invoices from Tenenbaum Berger because these invoices represent expenses incurred by the Receiver after the bankruptcy petition for court appearances defending the Debtor's efforts in state court to remove the Receiver from possession of the Property. (Debtor's Post-Trial Br. 31, ECF No. 196.) The Receiver incurred these expenses after the receivership ended, at a time when he was required to turn over possession of the Property pursuant to § 543(b)(1), and the court appearances provided no benefit to the estate. For this reason, because these fees were unreasonably incurred, the Proof of Claim should be reduced by $1,232.50.

The Debtor objects to $3,000.00 in additional paid and unpaid invoices by Tenenbaum Berger for appearances in landlord-tenant court during the receivership, because the Debtor believes that the Receiver incurred landlord-tenant fees on account of its own mismanagement by failing to register with HPD. (Debtor's Post-Trial Br. 31-33, ECF No. 196.) Of this $3,000.00, the Receiver seeks reimbursement for $975.00 worth of unpaid invoices in the Proof of Claim, and the remaining $2,025.00 were paid by the Receiver and are listed in the

Accounting. The Debtor's argument is that the Receiver was required by New York State law to register with HPD as a building owner, and that because he did not do so the Receiver should not have been able to open a case in housing court to pursue nonpaying tenants. (Debtor's Post-Trial Br. 31, ECF No. 196.) Although the Debtor argues that all appearances in housing court were useless as a means to obtain payment from tenants, it also admits that the housing court "failed to notice" the Receiver's failure to register with HPD. (Debtor's Post-Trial Br. 31-32, ECF No. 196.) Given that the Receiver was, by the Debtor's admission, able to file and pursue nonpayment cases in housing court even though he did not register as a building owner, the incurring of legal fees in doing so was neither unreasonable nor gross mismanagement. For this reason, the Proof of Claim will be allowed to the extent that it contains unpaid invoices from Tenenbaum Berger for appearances in housing court prior to the petition date, and the Receiver will not be surcharged for disbursements to Tenenbaum Berger for such appearances.[11]

**F. Building Management Fees**

The Debtor objects to $1,000.00 in building management fees to BPC Management incurred by the Receiver because, the Debtor argues, these fees were incurred during a time when the Receiver was not in possession of the Property. (Debtor's Post-Trial Br. 33, ECF No.

---

[11] Prior to trial, the Debtor argued that the Receiver applied funds sent from the New York City Department of Homeless Services ("DHS") for Apartment A to Apartment H in error, and as a result failed to commence default proceedings in landlord-tenant court against the tenant in Apartment H, costing the Debtor $5,350.00 in missed rental payments, and incurred unreasonable attorney's fees for taking the tenant in Apartment A to housing court. (Debtor's Pre-Trial Br. 18, ECF No. 147.) The Debtor offered into evidence Debtor's Exhibit CC, which purported to contain state court records relating to this point, but the records provided were not certified and therefore were not entered into evidence. (Trial Tr. 77:12-85:17, Aug. 4, 2014, ECF No. 179.) Although counsel was given the opportunity to renew their offer of Debtor's Exhibit CC into evidence with a certified copy, she never did so. The Debtor failed to present any other corroborating evidence relating to this argument at trial. (Trial Tr. 47:25-51:16, July 30, 2014, ECF No. 177.) And even if the Receiver incorrectly sued the tenant in Apartment A, the Debtor failed to present evidence to support the conclusion that the Receiver incorrectly applied the funds to Apartment H, failed to collect rent from the tenant in Apartment H, or that he acted improperly in not bringing the tenant in Apartment H to landlord-tenant court. Moreover, the Debtor did not address this argument in its post-trial brief. Accordingly, the Court will not surcharge the Receiver for incorrectly applying DHS funds.

196.) The Debtor argues that the Receiver should be surcharged $250.00 of the $500.00 monthly management fee for October 2010 because the Receiver was in possession for only half this month; that the Proof of Claim should be reduced $250.00, representing half of the January 2012 management fee, for the same reason; and that the Proof of Claim should be reduced an additional $500.00 for the monthly management fee from February 2012 because the Receiver was not in possession during this time.

Here, it is undisputed that the Receiver was in possession of the Property from October 12, 2010, until January 18, 2012. (Chesley Decl. 1, ECF No. 197.) As for the October 2010 management fee, BPC Management started managing the Property on October 12, and their $500.00 monthly management fee should have been prorated to $322.58 based on the 20 days that they were managing the Property in this month. Therefore the Court will surcharge the Receiver $177.42 (the difference between $500.00 and $322.58) for the October 2010 management fee. Likewise, BPC Management managed the Property until January 18, 2012, and their $500.00 monthly management fee for January 2012 should have been prorated to $290.32 based on the 18 days that they were managing the Property in this month. Therefore the Court will reduce the Proof of Claim an additional $209.68 (the difference between $500.00 and $290.32) for the January 2012 management fee. The Receiver should not be reimbursed for the building management fee from February 2012 after he was dispossessed of the Property, and the Proof of Claim will therefore be reduced an additional $500.00.

**G. The $750.00 Discrepancy in the Proof of Claim**

The Proof of Claim includes unpaid invoices that total $69,576.81. (Proof of Claim 7, Claim No. 3-3.) Taken together with the Receiver's request for $9,980.41 in commissions and for the $450.00 reimbursement of his renewal bond payment, the Receiver has only included

support for reimbursement of $80,007.22: $750.00 less than the total amount listed on the Proof of Claim. There is a $750.00 discrepancy between the $70,326.81 “Accounts Payable” amount listed on page four of the Proof of Claim and the total of unpaid invoices amount listed on page seven. (Proof of Claim 4 and 7, Claim No. 3-3.) Although the Debtor does not challenge this $750.00 discrepancy, the Receiver offers no explanation why his Accounts Payable total is $750.00 more than the total of his unpaid invoices. For this reason, the Receiver has failed to make a prima facie showing as to $750.00 of the amount sought in the Proof of Claim, and his recovery will be reduced accordingly.

## III. The Debtor’s Remaining Arguments

The Debtor broadly argues that, based on the Receiver’s failure to maintain the boiler, to maintain the Property in good repair, and to ensure sanitation, the Court should find that the Receiver grossly mismanaged the Property and the Proof of Claim should be disallowed. (Debtor’s Post-Trial Br. 36-40, ECF No. 196.) The Debtor further argues that the Receiver failed to file a Change of Management form with the New York City Division of Housing and Community Renewal (the “DHCR”), filed DHCR tenant registrations with incorrect monthly rent amounts, failed to obtain a court order to make improvements or repairs in excess of $1,000.00 in violation of the state court receivership order, failed to register with HPD, and that these actions amounted to “gross disregard for the law and failure to take responsibility over the Property . . . [which] casts a shadow on the Receiver’s entire claim.” (Debtor’s Post-Trial Br. 40-45, ECF No. 196.)

As discussed above, a Receiver may be surcharged based on gross mismanagement to the extent that his actions caused “great loss” to the estate. Title Guarantee & Trust Co. v. Adlake Corp., 290 N.Y.S. 1007, 1010 (N.Y. Sup. Ct. Queens Cty. 1936). Gross mismanagement does not mean incurring unnecessary or unreasonable expenses, violating minor terms of the order of

appointment, or making repairs to the Property in good faith. Here, the record does not support the conclusion that the Receiver caused great loss to the estate. Mr. Rosenberg testified that the Property was in a "dilapidated" condition when he first entered the Property at the start of the receivership. (Trial Tr. 36:10-13, July 31, 2014, ECF No. 178.) To the extent that the Debtor established, by the testimony of Mr. Barron or otherwise, that the Property was in poor condition after the receivership ended, there is no evidentiary basis on this record to conclude that the Receiver's actions caused such poor conditions. To the extent that the Debtor argues that the Receiver's actions were in violation of various city and state regulations for building owners, or of the receivership order, such violations do not amount to gross mismanagement of the Property sufficient to surcharge the Receiver. See Adlake, 290 N.Y.S. at 1010 (Holding that a receiver will be surcharged where he or she "has grossly mismanaged the property in his possession, resulting in great loss to the estate.").

To the extent that the Debtor seeks disallowance of the Proof of Claim based upon the Receiver's alleged pre-petition mismanagement, this argument misunderstands the legal standard under which the Court must evaluate the Proof of Claim. As discussed above, the Proof of Claim should be allowed to the extent that the Receiver seeks reimbursement for expenses that are reasonable pursuant to §§ 543(c)(2) and 503(b)(3)(E). In making that determination, the expenses for which the Receiver seeks reimbursement must be individually evaluated for reasonableness, as they have been in this decision. The Debtor's effort to disallow the Receiver's claim based on this broad-brush, conclusory approach is misplaced.

**IV. Receiver's Commissions**

The Receiver claims that he is entitled to $9,980.41 in commissions under CPLR 8004(a). This amount represents the statutory maximum rate of 5% of the rent that the Receiver administered during the receivership, plus 5% of the rent that the Debtor admittedly kept during

the receivership. The Debtor argues that the Receiver should not be entitled to any commission, because he grossly mismanaged the estate, as evidenced by the poor conditions at the Property. For the reasons discussed above, the Receiver did not grossly mismanage the Property, and therefore he is entitled to $9,980.41 in commissions.

## CONCLUSION

The Proof of Claim is allowed in the amount of $72,449.35. This amount represents the $80,757.22 requested in the Proof of Claim, minus $750.00 in expenses for which there is no factual support, minus the $3,347.50 "Balance of Unpaid Legal Fees" charge to Tenenbaum Berger for which there is insufficient factual support, minus $1,232.50 in expenses for post-petition court appearances by Tenenbaum Berger, minus $1,818.19 in improper Con Edison invoices that the Receiver withdrew, minus the $709.68 in building management fees for February 2012 and part of January 2012, and minus $450.00 for the renewal bond payment. As requested by the Receiver, the Court will cancel the surety on the bond nunc pro tunc to April 4, 2013. The Receiver is also surcharged $225.49, representing the $48.07 improper Con Edison invoice that the Receiver withdrew and $177.42 of the October 2010 management fee. The Debtor is directed to remit $72,223.86 of the funds escrowed during plan confirmation, representing the allowed amount of the Proof of Claim minus the amount that the Receiver is surcharged, to the Receiver. The Court will issue a separate order.

**Dated: Brooklyn, New York**
**August 21, 2015**

United States Bankruptcy Court
Eastern District of New York

Carla E. Craig

**Carla E. Craig**
**United States Bankruptcy Judge**